IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION                                                              PLAINTIFF

VS.                              NO. 2:21-cv-02134 PKH

HOSPITAL HOUSEKEEPING SYSTEMS, LLC                        DEFENDANT

### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The claims by the Equal Employment Opportunity Commission ("EEOC") center on the Essential Function Test ("EFT") administered by Defendant Hospital Housekeeping Systems, LLC ("HHS"). The EEOC advances two claims -- that the qualification standard used by HHS screens or tends to screen individuals with disabilities and that individuals who did not pass the qualification test were terminated based upon those disabilities. Neither is actionable. As stated in the Uniform Guidelines on Employee Selection Process, **"ability tests are among the most useful and valid tools available for predicting success in jobs and training across a wide variety of occupations.  Ability tests are commonly used for entry-level jobs, and for applicants without professional training or advanced degrees."** UGESP Chapter 4-1. The EEOC has pled two causes of action:

    a.    That HHS has used a qualification standard that screened out or tended to screen out individuals with disabilities; and

    b.    That HHS has violated the ADA by terminating employees with disabilities who failed to the pass the EFT because of their disabilities.

The EEOC has failed to demonstrate that any individuals identified in this matter were qualified individuals with disabilities or and that those individuals were

terminated as a result.  As such, this Court should enter summary judgment in favor of HHS on all claims.

## I.     <u>The Summary Judgment Standard</u>.

A key policy goal and primary principle of Fed. R. Civ. P. 56 is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Fed. R. Civ. P. 56 sets the standard for summary judgment:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

Summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322. "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). It is also well established that the "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 322. ("As to

materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.) "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (footnote omitted); *see also Barber v. C1 Truck Driver Training LLC*, 656 F.3d 782, 791 (8th Cir. 2011) (mere existence of a scintilla of evidence is not sufficient).  Ultimately, "[e]vidence, not contentions, avoids summary judgment."  *Al-Zubaidy v. Tek Industries, Inc.*, 406 F.3d 1030, 1036 (8th Cir. 2005).

## II.    Summary of Relevant Facts.

### A.    The Physically-Demanding and Fast-Paced Jobs at HHS, the Development and Job-Relatedness of the EFT, and Its Impact on Safety.

#### 1.    *Background on the housekeeping and floor tech positions as described by the claimants and other HHS employees.*

Housekeeper and floor tech positions (which have identical essential functions listed in the job descriptions, including walking, standing, reaching and kneeling continuously through a shift, being able to lift up to 40 pounds in general and lift furniture and equipment weighing 25-100 pounds frequently) are physically

2820156v-1

demanding jobs according to the claimants.[1] Further, because the housekeeping and floor tech jobs are in hospitals and other medical facilities where blood/bodily fluids can be found all over a room, basic cleaning is not enough – the rooms and all surfaces in them (including all surfaces on the beds and around floor level) must be sanitized.[2] It is essential for housekeepers to actually _see_ if they have cleaned and sanitized all of the blood/bodily fluids in a room, even at floor level.[3] This ensures infection control in these hospital facilities, which is absolutely critical.

The housekeeping and floor tech jobs also are fast-paced due to the need to open rooms for incoming patients (especially emergency rooms) or clean while certain

---

[1] _See_ Ex. 1 (Amador dep. at 29-30, 35-39, 42, 53-54 and ex. 1) (agreeing with job description); Ex. 2 (Bingham dep. at 19-21, 27) (discussing HHS housekeeping job being hard due to need to get on hands and knees to properly clean ICU and patient rooms); Ex. 3 (Gill dep. at 42-43) (describing how she was "non-stop" bending over/stooping/squatting to clean during her shift); Ex. 4 (Roberts dep. at 26-28, 70-72, Ex. 4 and 5) (discussing walking miles each day and agreeing with written job description for floor techs); Ex. 5 (Taylor dep. Vol. I at 47-48) (describing cleaning baseboards inches from the floor as the hardest part of the job); Ex. 6 (Yracheta dep. at 21-22, 31-33, 56-58, ex. 2) (agreeing with job description and describing walking up to 20,000 steps per day).

[2] _See_ Ex. 1 (Amador dep. at 32-34, 42-45, 50-51) (discussing blood dripping down bed all the way to the floor and sanitizing the room); Ex. 2 (Bingham dep. at 20-21, 26-27) (discussing wiping down all surfaces and how it was hard to get under bed); Ex. 5 (Taylor dep. Vol. I at 33-34, 47-49) (testifying to cleaning up blood "quite often," that it was important to clean and sanitize emergency rooms from floor to ceiling, and that the hardest part was cleaning baseboards); Ex. 6 (Yracheta dep. at 23, 65-66) (discussing "clean[ing] up a lot of blood" and being responsible for wiping down all surfaces, even those on floor level, in both ER rooms and patient rooms); Ex. 7 (King dep. at 50) (acknowledging importance of infection control and sanitization of patient rooms); Ex. 8 (Medina dep. at 28-30); Ex. 9 (Sidwell dep. at 21-22) (describing inspecting beds in wound care center to ensure no blood or other bodily fluids remained); Ex. 10 (Williams dep. at 45, 47) (testifying it was very important to get all surfaces germ-free/sanitized, including those surfaces close to the floor).

[3] _See_ Ex. 1 (Amador dep. at 30-31, 44, 53-54 (describing getting down on floor level to look under beds to ensure all surfaces were clean, something she did in all of her HHS jobs – housekeeper, supervisor and trainer); Ex. 2 (Bingham dep. at 19-20) (describing getting on hands and knees to clean under beds); Ex. 3 (Gill dep. at 28-29, 42-43); Ex. 5 (Taylor dep. Vol. I at 33) (had to clean blood off the floor quite often, at least a couple of times a week); Ex. 6 (Yracheta dep. at 36-37) (discussing need to get on floor level to do job as both supervisor and housekeeper).

patients (such as those in mental facilities) are not in their rooms.[4] There is a time component for everything they do, which is included on the daily assignment sheets for each employee on each shift. *See* Ex. 12 (Totten dep. at 57, 96). Depending on the shift, housekeepers and floor techs are often required to work alone. *See* Ex. 10 (Taylor dep. at 31) (agreeing that cleaning the ER was busy, in part because she was the only one on the night shift); Ex. 10 (Williams dep. at 59) ("The dangerous part of my job would be like being in the building late at night by myself."). Given the physically-demanding and fast-paced nature of these jobs, safety is a priority. This includes the use of proper body mechanics by HHS employees, which is outlined in HHS's employee policies. *See* Ex. 11 (Totten dep. at 34-35, 68-69); Ex. 13 (HHS Safety Policy No. 5). Many of the claimants acknowledged receiving specific training on body mechanics and testified (for instance) that the safest way to reach floor level was to bend using their knees.[5]

Housekeepers and floor techs can be assigned to various client facilities, including hospitals and medical offices, and those assignments can change at any

---

[4] *See* Ex. 1 (Amador dep. at 46-47, 53) (comparing the pace of cleaning hospital rooms versus other non-medical housekeeping jobs); Ex. 3 (Gill dep. at 25-26, 28-29); Ex. 4 (Roberts dep. at 24, 45-48, 57) (discussing need to clean the floors quickly due to danger of being around certain mental patients); Ex. 9 (Sidwell dep. at 38) ("No sir, we didn't have time for that" when asked whether she had time to chat with coworkers on shift); Ex. 6 (Yracheta dep. at 22-23, 25, 35-36, 48) (describing being fast as the most challenging part of the job -- "We have an ambulance coming. So I mean, that means hurry").

[5] *See* Ex. 1 (Amador dep. at 64); Ex. 2 (Bingham dep. at 19-20); Ex. 3 (Gill dep. at 64) (discussing training to bend with knees, not the back); Ex.6 (Yracheta dep. at 40, 48-49) (discussing proper form to get to the ground is to bend your knees); Ex. 7 (King dep. at 52); Ex. 9 (Sidwell dep. at 20-1) (training included how to safely perform job; safety was a priority); Ex. 10 (Williams dep. at 53, 62-63) (recalling being showed training films on how to pick up things/get to floor level by kneeling in order to avoid injury; she usually bent her knees to get to ground level); Ex. 22 (Lewis dep. at 51) (the proper way to lift something off the floor was "with your knees."); *see also* Ex. 11 (Totten dep. at 143) (discussing people injuring their backs by bending over instead of squatting or kneeling).

2820156v-1

time due to the needs of HHS's clients. *See* Ex. 11 (Totten dep. at 52-53); *see also* Ex. 10 (Williams dep. at 43-44, 48-49). Employees can also be assigned different jobs. One of the goals of HHS is to cross-train everyone since it is a priority "as it relates to being short-staffed." *See* Ex. 11 (Totten dep. at 52-53).

### 2. *The EFT's development and impact on safety.*

Prior to the EFT, HHS was being "inundated with injury activity to jobsite employees." *Id.* at 34-35. HHS's challenge was to answer "why is that occurring" and "what can we do to create a safe environment . . . for our team members, our employees, for hospital patients?" *Id.* at 34-35. The EFT was developed "to ensure that [HHS team members] can perform the fundamental tasks necessary to do the job.  And so all of the items in the EFT are components of tasks that are being performed by the team members." *Id.* at 28.  HHS developed the current version of the EFT although "we struggle with staffing companywide. And so we need every able-bodied applicant or person that we can get.  But the reality is not everybody can physically do this job. Having performed the job, I can speak to that." *Id.* at 42. Turnover rate for floor techs and housekeepers is 60% if not higher.  *Id.* at 45-46. Since implementing the EFT, safety numbers have in fact improved and now HHS's injury numbers are below national averages. *See* Ex. 11 (Totten dep. at 69-70); Ex. 14 (Baker Report, pp. 21-22).

The EFT represents "a fraction" of what an employee is going to be doing on a daily basis, and if an employee "struggle[s] or can't perform this small percentage of those tasks that you are going to be performing, then you're not going to be able to do

the job.  And it's our belief that ultimately you end up hurting yourself or someone

else." *See* Ex. 11 (Totten dep.at 36).

> Housekeepers are throughout the day moving throughout the facility,
> cleaning areas, climbing up on things, kneeling down, squatting.  It's
> challenging for an individual if they can't repeatedly kneel down, bend
> down, move about and by physically mobile – it's challenging for them
> to perform housekeeping tasks. If you are in a patient room and you
> struggle with kneeling, squatting, getting down and cleaning
> underneath beds and things of that nature, patients in a bed, you can't
> grab the handrail, grab the patient bed.  It becomes a risk for the patient
> and for the housekeeper.

*Id.* at 32-33.

In 2018, HHS began requiring managers and supervisors to take the EFT since

"it is almost a daily occurrence that a manager is going to be doing, not managing.

So they need to be able to safely perform the task just like the hourly team members."

And it is completely common and expected that a manager needs to be able to perform

the tasks just like hourly employees. *Id.* at 44-45, 90.

Jeff Totten (President, Compliance and Risk for HHS) developed the current

version of the EFT. *Id.* at 68-70. Totten has been employed by HHS since 1989 in a

variety of roles, and has performed every job duty that a floor tech or housekeeper

has done "hundreds of times." *Id.* at 17-18. Based on his decades of experience at

HHS, he is a subject matter expert. However, he did not rely solely on his own

knowledge and experience when developing the EFT.  In the creation of the EFT, he

spoke with a variety of people in the field and elsewhere within HHS who were deeply

familiar with the tasks performed on a daily basis by employees. *Id.* at 43-44, 74-76.

In 2021, HHS retained Dr. Todd Baker of HumRRO to review and analyze the job duties of its housekeepers as they related to the EFT. Dr. Baker reviewed a variety of documentation from HHS, including the housekeeping job description, a description of the EFT and its scoresheet, relevant policies and the training video demonstrating the EFT. He used that material to generate questions and a list of information to collect for site visits to three different facilities over a three-day period in June 2021 where he personally observed housekeepers performing their jobs. HumRRO also conducted interviews of housekeepers, including asking the housekeepers to describe the physical aspects of their jobs. A written questionnaire was created and given to twenty-one (21) housekeeping supervisors. *See* Ex. 14 (Baker Report, pp. 1-4). Dr. Baker found that the EFT was in fact content valid and detailed his findings in a written report. He also discussed the positive impact the EFT had on safety. *See* Ex. 14 (Baker Report, pp. 21-22) ("HHS injury rates are significantly lower than the corresponding [Bureau of Labor Statistics] rates.").

### B.   The EEOC's Multiple-Year Delay in Pursuing This Litigation.

Years after the first four EEOC charges were filed in 2015 and 2016, the EEOC filed this lawsuit. *See* Ex. 15 (Fier dep at 38-39) (noting the investigation stopped "several years" ago).[6]  The EEOC's own activity logs for these four charges show gaps in activity that are measured in years:

1.  Former lead claimant Yracheta was terminated in June 2016 and filed an EEOC charge shortly afterwards. *See* Ex. 6 (Yracheta dep. at 30-31); Ex. 15 (Fier dep. at 25); Ex. 16 (EEOC Investigator's Memorandum dated October 23, 2020, pp. 2-3). She reached out to the EEOC at least three times in 2017 and 2018 for a status update after no activity in the

---

[6] There is no "internal" EEOC time limit on how long an investigation should last. *Id.* at 38, 67-68.

file. *See* Ex. 15 (Fier dep. at 48-50, Ex. 2). According to the EEOC's logs, nothing of substance happened between November 2016 and June 2018. *See* Ex. 17 (Yracheta Activity Log, Bates No. EEOC 0001418 and 1421).

2. Claimant Roberts filed his EEOC charge in September 2015. Nothing substantive happened in the file between March 16, 2018, and March 2, 2020. There also was a gap of substantive activity between receipt of HHS's position statement on December 11, 2015, and the transfer to the Little Rock Area Office on October 26, 2017. See Ex. 18 (Roberts Activity Log, Bates No. EEOC 0000645 and 648).

3. Claimant Rodriguez filed his EEOC charge in September 2016. Nothing substantive happened in the file between March 2017 and March 2020 *See* Ex. 19 (Rodriguez Activity Log, Bates No. EEOC 0001128 and 1134). Rodriguez died in 2020. *See* Ex. 8 (Medina dep. at 45).

4. Claimant Gibbs filed her EEOC charge in July 2016. Nothing substantive happened in the file between May 25, 2017, and December 9, 2020. *See* Ex. 20 (Gibbs Activity Log, Bates No. EEOC 0000004 and 0000008-09).

The EEOC also delayed its investigation into one of the two charges filed after 2016. Claimant Gill filed her EEOC charge on December 15, 2017. On June 25, 2018, the file was transferred to the Little Rock Area Office. *See* Ex. 21 (Gill Charge Detail Inquiry/Activity Log, Document No. 232.17). After the transfer, nothing substantive happened (only a lot of "downloads") for over two years until a phone call with Gill's daughter in July 2020 that discussed numerous e-mails to Gill going unanswered. *See* Ex. 21 (Gill Charge Detail Inquiry/Activity Log, Bates No. EEOC 0000105-106).

Further, the "class" of employees identified by the EEOC (none of whom filed EEOC charges) who failed the EFT in 2016 was not disclosed to HHS until 2021.[7] *See*

---

[7] As the Lead Systemic Investigator, Linda Fier was the person who determined on behalf of the EEOC whether it believed a class existed. *See* Ex. 15 (Fier dep. at 14). The initial class members were listed in her Investigator's Memorandum dated October 23, 2020. *Id.* at 14, 52-53, ex. 3. That was the first time the class members were identified to anyone. *Id.* at 54.

2820156v-1

Ex. 12 (Molnar decl.); Ex. 16 (EEOC Investigator's Memorandum, pp. 2, 14). Numerous class members were not contacted by the EEOC until years after their terminations, and many do not remember significant details surrounding their employment at HHS. For instance:

1. Class member Bingham was terminated in 2016. She first received a letter from the EEOC in June 2017. *See* Ex. 2 (Bingham dep at. 36-37). She was interviewed by the EEOC in July 2018 and again two years later in July 2020.  *Id.* at 38; Ex. 17 (Yracheta Activity Log, Bates No. EEOC 0001421).

2. Class member Lewis was terminated in 2016. She does not recall any contact with the EEOC before the lawsuit. *See* Ex. 22 (Lewis dep. at 61-62).  The EEOC's records show a phone interview with Lewis on July 27, 2020 – nearly four years after her termination.

3. Class member Williams was terminated in 2016. She does not recall when she was contacted by the EEOC. *See* Ex. 10 (Williams dep. at 78, 80). She does not recall the names of her supervisors because "[i]t's been so long." *Id.* at 68.  She was first interviewed by the EEOC in July 2020. *See* Ex. 30 (EEOC Telephone Interview Note).

4. Class member Sidwell was terminated in 2016. She does not remember the names of her supervisors and does not remember having any issue she needed to report to a supervisor. *See* Ex. 9 (Sidwell dep. at 27-28). She does not remember who gave her the EFT, and she does not remember the name of her primary care doctor at time she failed the EFT. *Id.* at 53-54, 58.  Nor does she recall who contacted her from the EEOC or when that contact was made. *Id.* at 29.  The EEOC interviewed her in June 2018 and then again in July 2020. *See* Ex. 17 (Yracheta Activity Log, Bates No. EEOC 0001421).

The passage of time also has prejudiced HHS's ability to a) reconstruct what happened with the class members' EFTs and b) produce relevant personnel and other files on the class members. The EEOC did not disclose the class members to HHS until 2021 – five years after their terminations. *See* Ex. 12 (Molnar decl.); Ex. 15 (Fier dep. at 14, 52-54, ex. 3); Ex. 23 (HHS's Verified Responses to Discovery). Due to a

10

change to HHS's systems in 2017, the previously unidentified class members' personnel records were not retained by HHS. *See* Ex. 12 (Molnar decl.). The passage of five years has increased HHS's potential backpay liability, due to the EEOC's failure to identify these individuals on a timely basis.

### C. **Individuals Who Failed the EFT Who Were Not Disabled, Who Failed to Notify HHS of a Disability or Need for Accommodation, or Whose Impairments Were Unrelated to Failing the EFT.**

#### 1. *Former Lead Charging Party Andrea Yracheta*

The EEOC considered Yracheta the "lead charge" for this case and the basis for the class allegations.[8] *See* Ex. 15 (Fier dep. at 25, 33). Yracheta served as both a housekeeper and a supervisor for HHS in Fort Smith's Sparks Hospital (now Baptist). When Yracheta was a housekeeper for HHS, she primarily worked in the emergency room. *See* Ex. 6 (Yracheta dep. at 33). She also cleaned patient rooms. *Id.* at 24. As a supervisor, she described walking over 10,000 steps per day on the job, and some days she would walk 15,000-20,000 steps. *Id.* at 21-22, 58. If one of the housekeepers Yracheta supervised was out, she was expected to fill in.  *Id.* at 21, 32-33.

Yracheta helped administer the EFT to applicants and employees. No one failed in her experience. *Id.* at 53-54. But, Yracheta failed the EFT in June 2016, even though she thought she had passed it.  *Id.* at 50-51, 57. Yracheta never had any problems kneeling to the floor or getting back up while at HHS, had no knee or leg issues while at HHS, and had no problems with balance or standing on her toes. *Id.*

---

[8] The EEOC originally sought damages on Yracheta's behalf in the late 2020/early 2021 conciliation process, but ultimately dropped her because it did not consider her disabled.

at 14, 36-38, 40, 52.  In fact, she had no known physical issues at HHS. *Id*. at 52.  She testified that she could pass the EFT if she took it today. *Id*. at 51-52.

        2.  *George Rodriguez*

Rodriquez worked part-time as a floor tech for HHS from 2013 to June 2016. His floor technician job duties included cleaning/sanitizing hallways and stairwells. *See* Ex. 8 (Medina dep. at 28-30); Ex. 16 (EEOC Investigator's Memorandum, p. 3). Rodriguez signed job descriptions for housekeeping and floor tech positions. *See* Ex. 24 (Rodriguez Job Descriptions). Rodriguez signed multiple job descriptions because he had the potential to perform all of them at HHS's request. *See* Ex. 11 (Totten dep. at 52-53).

Rodriguez filed an EEOC charge on August 31, 2016, alleging HHS terminated him for failing the "squat" portion of the EFT because of "an injury to my foot." *See* Ex. 8 (Medina dep. at 38, 41); Ex. 25 (Rodriguez EEOC Charge). Rodriguez told HHS he could not perform the test. *See* Ex. 8 (Medina dep. at 41). However, Rodriguez told his daughter HHS terminated him because a supervisor wanted to hire a family member or friend. *Id*. at 35-36. Rodriguez died in 2020, before the lawsuit was filed. *Id*. at 45.

The EEOC takes the position that he was disabled due to diabetes, hypertension and a previous knee surgery. *See* Ex. 16 (EEOC Investigator's Memorandum, p. 3). However, Rodriguez's daughter testified that he had no problems performing his job duties due to any health conditions, had no work-related injuries, took no time off from work, and did not need light duty for any health reason. She

also testified he fully recovered from his 2010 knee surgery for a broken knee cap. *See* Ex. 8 (Medina dep. at 19-22, 25-26, 31, 33, 49-50).

Neither Medina nor Rodriguez considered Rodriguez disabled in 2016, and she had no knowledge of him requesting an accommodation. *Id.* at 41, 43, 45. His only concern was potential pain from overusing his knee, although his daughter testified, "I don't think he was in pain then." *Id.* at 37-38.

### 3. *Maria Lewis*

Lewis worked in the culinary department at HHS. *See* Ex. 22 (Lewis dep. at 14). In her role as a dietary clerk, she delivered meals to patients, cleaned-up work areas (including the dishwashing room and cafeteria), and stocked food and other supplies in the pantries and a walk-in refrigerator. *Id.* at 24, 26-27. She would stock food and supplies over her head (sometimes using a step stool or ladder) and on floor level; she also had to go to floor level to wipe down surfaces and pick up trash. *Id.* at 27-28, 39. Lewis testified the proper way to lift something off the floor was "with your knees." *Id.* at 51.

Due to arthritis, she had some level of "tolerable" pain in her knees and joints. *Id.* at 40-41. However, the pain did not keep her from stooping or kneeling down, it never caused her to ask for light duty, it never caused her to ask for any sort of change to her duties, it never limited her while working for HHS, and it does not limit her in any way today. *Id.* at 42-43. Her main complaints -- she cannot do cartwheels, run, or kneel for long periods of time while at church (none of which she had to do at HHS). *Id.* at 44-45.

Lewis took the EFT in June 2016. She failed various parts of the EFT, including demonstrating the ability to squat to clean low areas and/or remove debris/trash from the ground, the ability to kneel to complete general low shelf stocking and cleaning, general balance, and the ability walk up and back down one flight of stairs. *Id.* at 51-52, 64-67, ex. 1. She did not ask for any change to the test. *Id.* at 54. She claims to have given a doctor's note to her supervisor before the test discussing limitations in the range of motion for her knees. *Id.* at 54, 59-60. That note had never been produced.

### 4. *Debra Bingham*

Bingham's housekeeping job entailed a lot of walking (she was responsible for cleaning 18 rooms), lifting trash bags, standing for long periods of time, and getting down to floor level and back up again. *See* Ex. 2 (Bingham dep. at 23-27). She characterized housekeeping as a tough job because one is "constantly cleaning all day and moving around, bending." *Id.* at 35-36. Working for HHS was the hardest housekeeping job she had because one had to get on hands and knees to clean, particularly when there was blood on a mattress, bed frame or floor. *Id.* at 19-21.

Bingham failed the EFT because she could not get up after kneeling down. *Id.* at 30-31. She was given a second chance to pass the squatting/kneeling part of the EFT. *Id.* at 31. However, Bingham did not attempt to pass that part of the test; instead, she handed in her HHS badge because she was too tired. *Id.* at 32-34. Bingham had no injuries or medical restrictions while working for HHS, and never had any need for light duty at HHS. *Id.* at 21-22, 28. She characterized her overall

health and fitness while at HHS as "good." *Id.* at 27. Although she had high blood pressure, Bingham conceded it had nothing to do with her failing the EFT. *Id.* at 40. While the EEOC claims Bingham was disabled due to a back issue, she injured her back while working at a nursing home facility *after* leaving HHS. *Id.* at 11-12.

      *5. Angie Amador*

Amador worked for HHS in Fort Smith's Sparks Hospital (now Baptist) starting in late 2013; she cleaned in the ICU and labor/delivery areas. Amador left HHS in August 2014, but came back in March 2015 at which point she cleaned and served as a supervisor. She left again to work at another hospital in December 2015. *See* Ex. 1 (Amador dep. at 23-25). She returned to HHS in May 2016 in a trainer role. *Id.* at 26-27. In that role, she administered EFTs to new employees. No one failed the EFTs she administered. *Id.* at 27.

Amador agreed that the position responsibilities and essential functions for the housekeeper position listed in the job description were accurate, including being capable of "standing, walking, squatting, bending, twisting, kneeling, and reaching continuously through a shift." *Id.* at 37-8, ex. 1. But her hardest job at HHS was being a supervisor. "It was very demanding as far as having to go to this room or to that room, or to this area of the hospital, to that area of the hospital. Like, walking a lot as well." *Id.* at 35, 38. And as a supervisor, she would have to fill in for a housekeeper who did not show up for a shift.  *Id.* at 36. Amador described getting down on floor level to look under beds to ensure all surfaces were clean as her hardest duty,

something she did in all of her HHS jobs – housekeeper, supervisor and trainer. *Id.* at 53-54.

Amador failed the EFT on June 21, 2016. *Id.* at 65-66; *see also* Ex. 16 (EEOC Investigator's Memorandum, p. 14). She was unable to perform the lunges part of the test – specifically, not being able get back up without using her arms. *See* Ex. 1 (Amador dep. at 65-66). Amador had no knee or leg problems while working at HHS, and had no problems with her balance, getting on her toes, or her grip. *Id.* at 55, 66-67, 70, 75, ex. 2. In fact, she had no restrictions of any type from a doctor. *Id.* at 55-56. Amador conceded her only health impairment at the time (high blood pressure) had nothing to do with her inability to get up and down, and she did not consider herself disabled at the time. *Id.* at 66-67, 70, 75, ex. 2; Ex. 25 (EEOC Charges).

### 6. *Debra Parry*

HHS hired Parry in May 2019 to be an assistant director. *See* Ex. 16 (EEOC Investigator's Memorandum, p. 5); Ex. 25 (EEOC Charges). The terms "director" and "manager" are interchangeable. *See* Ex. 11 (Totten dep. at 22-23).

Parry had her right knee replaced in 2017. *See* Ex. 26 (Parry dep. at 18-19). However, she had no medical restrictions from her doctors, and could use her knee however she wanted. *Id.* at 27-28. She had no problems with walking or climbing stairs. *Id.* at 36-37. In fact, she had no issues taking the EFT, and her knee was not hurting at the time. *Id.* at 28-29, 33. She simply refused to kneel during the EFT. *Id.* at 34. Parry did not ask to retake the EFT, and she did not ask HHS to modify the

test.  *Id.* at 64. She just felt taking the EFT was "unfair," even though she was able to do it.  *Id.* at 64-66.

### 7. *Kathryn Gill*

Gill, who was a housekeeper, did not allege that the EFT was discriminatory in her 2017 EEOC charge; instead, she alleged that HHS discriminated against her due to her vision impairment. *See* Ex. 3 (Gill dep. at 79-80); Ex. 25 (EEOC Charges). Gill is legally blind and cannot drive due to a lack of peripheral vision. *Id.* at 11. Because of this, Gill biked or walked ten miles round-trip to work and back each day. *Id.* at 11.  Gill also walked several additional miles a day during her housekeeping shift – typically twelve (12) or more miles according to her pedometer. *Id.* at 39-40. Gill worked in the emergency room department while employed with HHS, and was the only housekeeper during her shift on her floor. *Id.* at 24, 49-50. Of all the jobs she has performed, housekeeping was the most physically demanding. *Id.* at 23-24.

Gill had her right knee replaced in 2015.  *Id.* at 52-53. Following recovery, she had no restrictions -- her doctor gave her a clean bill of health. *Id.* at 34-35, 54-55. She in fact "had full function of it" and could bend it 90 degrees. *Id.* at 36-38.  Her only issue – the knee was sensitive to the touch, so she did not like to place it on the floor. *Id.* at 36-37. She was trained to bend with her knees, not her back, due to job safety concerns. *Id.* at 64.

Gill took the EFT after returning to work from an accidental trip and fall at the hospital. *Id.* at 65-66, 73-74. The fall resulted in bruising, but no broken bones, and there were no long-term consequences. *Id.* at 67-69. When she took the EFT, she

17

could not perform the lunge part. *Id.* at 69, 82-83, ex. 2. She could bend her right knee at the time; she just couldn't touch the floor with it. *Id.* at 36-37. Her manager did not terminate her employment after the first failed EFT; instead, he allowed her to retake it a few days later. She testified that she failed the second EFT because of the lunge and squatting requirements. *Id.* at 70-71, 82-83, ex. 2. However, her second EFT form indicated that she passed the kneeling parts of the test in which she had to touch a knee to the floor. She in fact failed the squat test. *Id.* at 82-83, ex. 2.

       8. *Mary Williams*

There were two phases to Williams' work for HHS – she first did housekeeping six hours a day at Good Shepherd Medical Center for a period of time and then moved to H.G. Mosley (a rehabilitation facility) for three years, where she did housekeeping and laundry. *See* Ex. 10 (Williams dep. at 10-11, 14-15, 73). Williams also would clean patient rooms at the hospital during the holidays and understood that HHS could make her work in the hospital whenever it needed her to do so. *Id.* at 43-44, 48-49.

Williams claims to have had a "slight" heart attack while working at Good Shepherd – she experienced some shortness of breath while running up and down stairs. *Id.* at 17-19, 50. She testified that her doctors used stents to treat her, although she is not sure if the stents were placed in her heart arteries. *Id.* at 18-19, 75. Wherever those stents were located, Williams had her doctors take them out -- "I had them removed 'cause I didn't need them." *Id.* at 74. Williams felt "100%" after about a week. *Id.* at 20. Williams in fact had no restrictions from her heart doctors, and did not consider herself disabled. *Id.* at 58, 76.

Whatever medical issue Williams had did not limit her ability to do her housekeeping duties, which included a lot of walking and standing. *Id.* at 20-21, 57-58. Williams had no problem with her balance, pushing a cart, getting to floor level, or getting back up. *Id.* at 57. She never asked for light duty (even after her shortness of breath/heart issue) and never asked for any type of accommodation for her job duties. *Id.* at 58-59.

Williams failed the EFT in 2016. *Id.* at 63; Ex. 16 (EEOC Investigator's Memorandum, p. 14). She recalls having to lift boxes and walk up and back down one flight of stairs. *Id.* at 63-65. She had used the stairs before in a clinic storage building that had no elevator. *Id.* at 66-67. Since leaving HHS in 2016, she has not filed for short or long-term disability payments of any type, including Social Security disability. *Id.* at 59.

### 9. *Diane Sidwell*

Sidwell, who was a housekeeper, was pre-diabetic, but that condition never impacted her ability to do her job. *See* Ex. 9 (Sidwell dep. at 20, 42-43). Toward the end of her employment, Sidwell used a cane when walking long distances, although she had no specific injury or condition. *Id.* at 42-46. She did not use her cane while on shift, and did not use it all the time when walking 15 minutes from the parking lot to the time clock. *Id.* at 25-26, 44-45. Sidwell claims she told her supervisor that she was having issues with her right knee, but she never asked for any type of accommodation, never had problems performing her job duties, and never told anyone at HHS that she might need a knee replacement. *Id.* at 45, 49-50, 55. She in fact had

no physical restrictions from her doctor at the time and had not requested light duty. *Id.* at 54.  Nor did she request FMLA or take any vacations days related to her right knee.  *Id.* at 78.

Sidwell took the EFT at the same time as others in the facility, so she did not think she was being singled out. *Id.* at 50-51. She failed the balance, the squat and stairs portion of the EFT. *Id.* at 53-54, 62-63. She did not request to be exempted from the EFT and did not ask to use her cane during the EFT. *Id.* at 52-53, 79. After she failed the EFT, she did not ask to take it again. *Id.* at 62, 69.  She was aware of the HHS employee hotline, but never felt the need to call it.  *Id.* at 28.

10. *Sheila King*

Sheila King claims to have had arthritis in her left knee when employed as a housekeeper. However, she does not recall when she started experiencing issues with her knee. *See* Ex. 7 (King dep. at 49). King never complained about being in pain while performing her job and in fact experienced no pain when reaching to the floor. She never felt there was a time when she could not complete her job duties. *Id.* at 21-22. She also made no complaints to her supervisor about her job in general, and never asked her supervisor to limit her job duties in any way. *Id.* at 22, 30. King had no on-the-job injuries, and no injuries off-the-job that impacted her ability to do her work at HHS. *Id.* at 30.  Although King "sometimes" used a cane when walking into the facility, she did not use a cane on the job and did not tell any supervisor that she used a cane. *Id.* at 10, 55. She used no assistive devices at home (such as a cane or walker) while employed at HHS.  *Id.* at 11.

2820156v-1

King failed the EFT in June 2016.  She had no medical restrictions at the time. *Id.* at 40. King had high blood pressure, but conceded it had nothing to do with failing the EFT. *Id.* at 55. King testified that the EFT was not difficult except for the squatting part, which she claimed was "kind of hard" for her. *Id.* at 37. But, the issue with squatting was simply that she "might fall over forward or something." *Id.* at 38-39. She could not testify that any arthritis pain she was experiencing in her knee at the time had anything to do with failing the EFT – "I don't know. It could have been. I don't know." *Id.* at 49. King did not tell her supervisor that the squatting movement was "kind of hard" for her, and did not ask her supervisor to excuse her from that part of the test. *Id.* at 39.

> 11. *Kattie Taylor*

Taylor worked from May 2015 through July 2016 as a housekeeper for the emergency room and patient rooms. *See* Ex. 5 (Taylor dep. Vol. I at 17, 20-23). She described her job in the emergency room as "taking care of it if someone come in sick or throw up or have a mishap, come in a person with a heart attack or we had to clean blood, we would have to go get clean linens and bring in towels, we would have to mop the floor, make the bed, whatever the nurse would ask us to do . . . ." *Id.* at Vol. I 27-28. Taylor never asked for help with any particular tasks. *Id.* at Vol. I 27.  There was never a time when she could not clean the floors or reach overhead, and she never felt unable to do her job as a housekeeper. *Id.* at Vol. I 34, 44. The hardest part of job was cleaning the floorboards since she had to get down on her knees.  *Id.* at Vol. I 47-48. Taylor told her supervisor it was difficult for her and asked to be excused from

cleaning baseboards, to which her supervisor said she "couldn't perform [her] job." So, she "continued to work on." *Id.* at Vol. I 48-50.

Taylor had one injury at HHS. A bed she was rolling to the ER hit her knee – but she never reported the injury to HHS.[9] *Id.* at Vol. I 51-52, 54-55. Despite banging her knee, she was able to continue rolling the bed to the ER and finish her shift. *Id.* at Vol. I 56. Taylor saw a doctor in the ER about the knee, but does not recall the doctor's name. *Id.* at Vol. I 57-58. She was never given any type of medical restriction for the injury and was still able to perform her job afterwards. *Id.* at Vol. II at 11. Taylor did not take any medications for pain while working for HHS apart from Advil and never went to a doctor to ask for anything stronger. *Id.* at Vol. I at 45; Vol. II at 27-28.

Taylor had high blood pressure and would get light-headed once a month while working for HHS, but never told anyone about this since there was "no supervisor around." *Id.* at Vol. II 28-29. She was the only person cleaning the ER rooms. *Id.* at Vol I at 31-32. She would simply sit down for a minute when she got dizzy. *Id.* at Vol. II 28-29. Taylor never asked her supervisor for any type of accommodation. *Id. at* Vol. II at 11. She also knew of the HR hotline, but never called it. *Id.* at Vol. I at 51.

---

[9] Taylor reversed course later, testifying that once she told her supervisor about the knee injury, she was immediately terminated due to her race, gender and age. *Id.* at Vol. I 57, 61; Vol. II at 9-10.

**D.**      **Individuals Who Were Not Qualified Individuals or Who Posed a Direct Threat to Themselves or Others.**

*1.* *Vernestine Gibbs*

Gibbs worked at a facility in Georgia from November 2014 until May 2016.  *See* Ex. 25 (EEOC Charges). Gibbs cleaned rooms in the labor and delivery department, the med-surg department, and the ICU. *See* Ex. 27 (Gibbs dep. at 17-19).  And she was in near constant pain -- some days she described her pain level as a 7-out-of-10, and some days it was worse. *Id.* at 40-41. In fact, she was on Social Security disability while working at HHS due to chronic pain syndrome and arthritis. *Id.* at 64-66, 83.

Gibbs requested light duty in May 2016, but was told that HHS would need to "find more people (employees) in order to consider her request." *See* Ex. 25 (EEOC Charges). Gibbs wanted a job with less walking, less standing, less lifting, and less bending to get to floor level to clean. *See* Ex. 27 (Gibbs dep. at 43-44). Gibbs requested "light duty" due to her arthritis in her hips and knees, the fact that she could not lift much weight, and the fact that she could not bend her knees. Gibbs also claimed her doctor said simply standing on the concrete floors impacted her knees. *Id.* at 38-40.

Gibbs had several challenges performing her job duties, including:

1. **Walking**.  Gibbs would have to walk during her shift and push a heavy cart.  *Id.* at 31-32. Gibbs experienced pain simply walking from her car in the parking lot to the hospital, and described walking from the parking lot as "physically hard." *Id.* at 32-35.

2. **Mopping.**  Mopping in general was an issue, and there was a lot of mopping on her job at HHS. She especially had problems mopping behind beds since one had to lift them up and take them apart, and some parts of the beds were heavy to her. *Id.* at 27-30.

3. **Getting to Floor Level**. Gibbs had problems stooping/getting down to floor level to clean due to her knees. *Id.* at 35-38. According to

Gibbs, she had to clean/sanitize on floor level in every room, and if she "had gotten down" on floor level, she "couldn't get up." *Id.* at 53-54.

While she said the quality of her cleaning was not impacted, her physical conditions caused her to take a "much longer time" to clean. *Id.* at 45. She had to clean rooms at her "own pace." *Id.* at 46-47.

### 2. *Rodney Roberts*

Roberts worked at a mental health facility for HHS as a floor tech. *See* Ex. 4 (Roberts dep. at 8-9, 24). He described "dealing with mental patients" as the most dangerous part of his job. *Id.* at 57. Because he was dealing with mental patients, he could not leave any tools around. *Id.* at 55. As a floor tech, Roberts "was constantly walking" and "was constantly on [his] feet." *Id.* at 38, 48. He estimated that he walked five-to-six miles a day. *Id.* at 27-28. And he was constantly in pain due to his knees – on a scale of one-to-ten, he said his pain levels were "[t]welve, fifteen constantly." *Id.* at 38. He experienced significant pain in both knees in 2015 due to bone-on-bone contact.[10] *Id.* at 20. Roberts also had "bad" arthritis in his back. *Id.* at 18. His neuropathy was so bad during the time he worked for HHS, he had numbness in his feet and legs every day. *Id.* at 40. The bottoms of his feet have been totally numb for eight years – if someone touched them, he "wouldn't even know you touched them." *Id.* at 40-41.

His job description's list of essential functions including being "[c]apable of standing, walking, squatting, bending, twisting, kneeling and reaching continuously

---

[10] He in fact was wearing sleeves on his knees even before working for HHS to keep his knees from buckling.  *Id.* at 21-22.

through a shift." *Id.* at 70-71, ex. 4. Roberts agreed with all of the bullet points under "position responsibilities" and "essential functions" in his job description. *Id.* at 72. Apart from the danger of working around unpredictable mental patients, the most challenging part of the job was working on a time limit when cleaning patient rooms. It was necessarily a fast-paced job. *Id. at* 46-48.

Roberts claims he did not have to get down on his knees to clean baseboards or scrape wax buildup from the edge of the floors. *Id.* at 22, 50. He used a pole that had a razor blade on the end of it, but HHS made him stop using it. *Id.* at 54-55. He then started using a mop handle with a normal-sized scrubbing pad at the end to get rid of the wax buildup.  *Id.* at 55-56. The scrubbing pad was not attached to the broom handle – he simply used pressure to hold it on. *Id.* at 56. HHS was not aware he was using the mop stick to clean the baseboards and scrub the wax build-up off. *Id.* at 87.

When Roberts first heard about the EFT, he obtained a note from his doctor:

> Please note that Mr. Roberts has the following conditions that will impact his functional capacity testing for his employer: Diabetic neuropathy, generalized osteoarthritis and planta fibromas.

*Id.* at 67-68, ex. 1; *see also* Ex. 16 (EEOC Investigator's Memorandum, p. 2; Ex. 4 (Roberts dep. at 81-84, ex. 6). Although he did not provide his doctor a job description, Roberts told his doctor that he ran floor machines and did a lot of walking. *See* Ex. 4 (Roberts dep. 84). Although his doctor's note did not prohibit taking the EFT, Roberts refused to take the EFT because he did not believe he could pass it. *Id.* at 62-64. In fact, Roberts EEOC charge states, "On July 31, 2015, I was terminated by Harrison Glover, Assistant Manager, after I informed him that I couldn't take the functional

Capacity Test due to my disability." *Id.* at 81-84, ex. 6.  Roberts knew of no employees who refused to take the EFT.  *Id.* at 60.

Roberts applied for a couple of janitorial jobs after leaving HHS, but was unable to complete a sixty-minute trial run at one. Roberts chose not to pursue any other jobs because "my disabilities [were] affecting me." Although he had been a truck driver, he never considered driving again "[b]ecause of my knees and arthritis and neuropathy," which he felt would keep him from "getting up and down in that truck." He also rejected going back to being a cook because he could not stand due to his arthritis. Roberts went into total kidney failure in 2016 or 2017, which would have prevented him from doing the floor tech job. *Id.* at 14-15, 17-18, 26.

HHS was Roberts' last job; he is now totally disabled and unable to work. He applied for Social Security disability shortly after leaving HHS. *Id.* at 8, 13. Roberts went into total kidney failure in 2016 or 2017, which would have prevented him from doing the floor tech job.  *Id.* at 18, 26.

### E.    Claimants Who Failed to Mitigate Damages.

For brevity's sake, the following table details the lack of mitigation for the following claimants, with exhibit references in parentheses:

| Lewis | Lewis failed the EFT and was discharged on September 9, 2016. Lewis was out-of-work for a very short period of time -- she only drew one unemployment check between jobs, and did not know how much actual income she lost. She started working at Jack & Jill Childcare on October 17, 2016, as a cook for $12 per hour, 35-40 hours per week; this was over $2 per hour more than she was making at HHS ($9.38 according to her Jack & Jill application). Although she lost her outside medical insurance that she purchased on her own, she has incurred no medical expenses since leaving HHS. |
|---|---|

| | |
|---|---|
| | Days after starting at Jack & Jill, she received a job offer from a local veterans' home at $12 per hour with insurance benefits and vacation/sick time. Lewis turned down the job because she did not want to leave Jack & Jill "hanging." Lewis has not looked for additional employment outside of Jack & Jill because she "wouldn't have time for her husband," whom she did not see a lot while at HHS. Lewis is happy with her job duties and happy with her schedule at Jack & Jill. (Ex. 22 at 9-10, 12-16, 19-21, 47- 50, 61-63; Ex. 28 (Employment records from Jack & Jill Childcare, p. 5)). |
| Licea | Licea worked up to forty hours a week at HHS while also working twenty-five hours a week at another job (Pep Boys). In April 2016, Licea had a serious motorcycle accident. When Licea returned to work at HHS and Pep Boys in October 2016, he failed the HHS EFT.<br><br>He chose not to apply for other housekeeping positions – "I gave up right there.  .  .  .  I don't want to be disappointed." He applied at Sears six months after he started working again at Pep Boys, but Sears had no openings at the time. Licea stopped trying to find other auto mechanic jobs at that point, despite the fact there was "a lot" of that work in his community. Part of the reason for his decision was a friend telling him "they just going to tell you no." And he did not apply at Jiffy Lube-type businesses because they were "below" him.<br><br>Licea is satisfied with the job he has today and satisfied with working just forty hours a week. (Ex. 29 at 9-12, 22-24, 28-29, 57-58, 60, 66-69). |
| Roberts | Roberts chose not to pursue any other jobs because "my disabilities [were] affecting me." He applied for Social Security disability shortly after leaving HHS. Roberts went into total kidney failure in 2016 or 2017, which would have prevented him from doing the floor tech job. (Ex. 4 at 8, 13-15, 17-18, 26). |
| Sidwell | Sidwell moved to Indiana at some point "five or six years" ago due to her mother's illness. She did not apply for any jobs in Indiana due to taking care of her mother, and she would have moved regardless of her employment status at HHS. She has not applied for any hospitality or housekeeping jobs even though she believes she could physically do them. She has no plans to go back to work, although she would consider it if needed for financial reasons.  (Ex. 9 at 9, 47, 63, 65-69, 74). |
| Taylor | Taylor did not file for unemployment following the loss of her job because she went right back to work caring for her great grandkids. She knows of no amount of money she is owed because she lost her job at HHS. When Taylor did start looking for work, "COVID was going around and nobody – everything was like on shutdown." (Ex. 5 at Vol. I at 15-18, 21-22; Vol. II 16-18). |

| Williams | Williams did not seek other employment once she left HHS in 2016. She did not consider looking for another job because she was drawing Social Security. She has no regrets leaving HHS. (Ex. 10 at 26-27, 29, 52-53, 83-84; Ex. 30 EEOC Telephone Interview Notes). |
|---|---|

## III.   <u>Argument and Authorities</u>.

HHS contends that the EEOC has failed to meet its *prima facie* case to support that the claimants are qualified individuals with disabilities to maintain any claim in this matter. The possibility of a reasonable accommodation is part of a plaintiff's initial burden when presenting a *prima facie* case of disability discrimination. *See Moritz v. Frontier Airlines*, 147 F. 3d 784, 788 (8th Cir. 1998).  Here, the EEOC has not alleged or established any potential "accommodations" that would have allowed each of the claimants to continue to meet the essential functions of their positions. Although an ADA plaintiff retains the ultimate burden of proving that he or she is a qualified individual, an employer who disputes the plaintiff's claim that he or she can perform the essential functions of a job must put forth evidence establishing those functions. *See Benson v. Northwest Airlines, Inc*., 62 F.3d 1108, 1113 (8th Cir.1995) (because defendant disputes plaintiff's evidence that he can perform the essential functions of the mechanic's job, it must put on some evidence of those essential functions).

HHS had done this in various ways, including through the testimony of the claimants, the testimony of Jeff Totten, and Dr. Baker's detailed report. An essential function may be established by evidence that includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the

job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs. *See Moritz*, 147 F.3d at 787-788 (internal quotation marks omitted). If an employee can show a reasonable accommodation is possible, then burden then shifts to the employer to show that it is unable to accommodate the plaintiff. *See Coates v. Discount Tire Company of Nebraska, Inc.*, 8:20-CV-139, 2021 WL 4991526, *3 (D. Neb. Oct. 27, 2021). An employer is not required to "accommodate" a disabled employee by eliminating essential functions of the employee's job. *Id.* at *4 (stating that an employer is not required to reassign or reallocate essential functions of a job to accommodate a disabled employee).

Here, HHS has established that these functions are essential through the judgment of the employer, based upon four decades plus in this industry, which is confirmed in the written job descriptions and the claimants' own testimony. Further, the analysis done by Dr. Baker confirms that the tasks reflected on the essential function test mirror what housekeepers do in their job roles daily. The EEOC's failure to show which accommodations would have allowed them to perform the essential functions of their jobs is fatal to any claim and summary judgment should be entered in favor of HHS. Even if any disability and potential accommodation is assumed, the EEOC's claims still fail as detailed below.

**A.      The EEOC's Class Claims and the Claims of Four of the Charging Parties (Roberts, Gibbs, Rodriguez and Gill) Should Be Barred Under the Doctrine of Laches.**

The equitable doctrine of laches is a proper defense to claims of discrimination based upon a post-charge delay by the EEOC or a private party in filing a lawsuit. *See Brown-Mitchell v. Kansas City Power & Light Co.*, 267 F.3d 825, 827 (8th Cir. 2001) (involving private plaintiff who filed EEOC charges, but did not file a lawsuit until six years later); *EEOC v. Liberty Loan Corp.*, 584 F.2d 853, 856-57 (8th Cir.1978) (total period of delay in bringing suit was four years and four months; none of the relevant supervisors were working for defendant and personnel records were unavailable.). Laches applies when (1) the plaintiff unreasonably and inexcusably delayed filing the lawsuit and (2) prejudice to the defendant resulted from the delay, such as witnesses who cannot remember details about a plaintiff's employment, lack of access to witnesses or records, and increased backpay liability. *See Brown-Mitchell*, 267 F.3d at 828-829 (district court did not abuse its discretion in concluding that defendant had sufficiently demonstrated prejudice; a number of witnesses testified that they could not remember details about plaintiff's employment); *Whitfield v. Anheuser–Busch, Inc.*, 820 F.2d 243, 244-245 (8th Cir.1987) ("[L]aches may apply either when the delay in bringing suit was caused by a private plaintiff or when the delay is the fault of an administrative agency."); *EEOC v. Peterson, Howell & Heather, Inc.*, 702 F. Supp. 1213 (D.Md. 1989) (court cited increased back pay liability resulting from delay as "an even more palpable prejudice than the difficulty of defending itself at trial.").

The first EFT-related EEOC charge was filed in 2015 (Roberts), and every class member for whom the EEOC seeks relief failed the EFT in 2016. Yet, the EEOC drug its feet for years according to its own Activity Logs for the charges filed in 2015-2017 -- it did not interview the members of the class until 2020, failed to notify HHS of the purported class members until 2021, and did not file a lawsuit until six years after the first EEOC charge. These delays led to demonstrable prejudice to HHS through increased potential backpay liability and limited access to management witnesses and personnel records. The Court should grant HHS summary judgment against the EEOC on its claims for Roberts (2015 charge), Gibbs (2016), Rodriguez (2016), and Gill (2017), and the entire "class" (none of whom filed their own EEOC charges or sought to pursue individual claims in court).

**B.** **The EFT Does Not Screen Out Qualified Individuals with Disabilities and Is Otherwise Job-Related and Consistent with Business Necessity.**

Under 42 U.S.C. §12112(b)(6), the term "discriminate against a qualified individual on the basis of disability" includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities *unless* the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." (emphasis added). The EEOC's own regulation mirrors this language. *See* 29 C.F.R.

§1630.10 (regulation on qualification standards, tests, and other selection criteria).[11] In this case, as demonstrated above, many of the named individuals and class members were not actually disabled. This is a fundamental element, which the EEOC has not established.  Since this fundamental element is missing, no further analysis is required to issue summary judgment.  To the extent this Court disagrees, HHS can still demonstrate that the EFT does not screen or tend to screen individuals with disabilities.

The EFT does not target a class of individuals with disabilities.  In reality, only a tiny fraction of those taking the EFT failed, since the passage rate was 99.9% companywide.  The identified class members represent 0.000135% of HHS employees who took the EFT. In this case alone, former lead claimant Yracheta (who was dropped by the EEOC pre-litigation) and other claimants (such as Amador, Bingham, Gill, King, Lewis, Parry, Rodriguez, Sidwell, Taylor and Williams) were not disabled, but still failed the EFT. By failing to show the EFT tends to screen out disabled individuals, the EEOC cannot establish that the EFT violates the ADA.  Summary judgment must be entered in favor of HHS.

Even if the EEOC could establish that the EFT targets a class of individuals with disabilities, the EFT is job-related and consistent with business necessity. To show job-relatedness, "an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform" the

---

[11] The phrase "qualification standard" may include a requirement that an individual not pose a "direct threat" to the health or safety of the individual or others in the workplace. 29 C.F.R. §1630.15(b)(2); 42 U.S.C. §12113(b).

essential elements of the job. *Harris v. Union Pacific R.R. Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020) (citing *Atkins v. Salazar*, 677 F.3d. 667, 682 (5th Cir. 2011) (for a qualification to be job-related, "the employer must demonstrate that the qualification standard is necessary and related to the specific skills and physical requirements" of the position)). "Courts will readily find a business necessity if an employer can demonstrate . . . a medical exam or inquiry is necessary to determine whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." *See Parker v. Crete Carrier Corp.*, 839 F.3d 717, 722 (8th Cir. 2016) (analyzing the job-relatedness and business necessity of a medical examination under 12112(d)(4)(A)) (quoting *Thomas v. Corwin*, 483 F.3d.516, 527 (8th Cir. 2007) (noting that safety is a business necessity)). Despite the EEOC's claims otherwise, it is not necessary that the EFT be externally validated. *See E.E.O.C. v. Dial Corp.*, 469 F.3d 735, 742 (8th Cir. 2006) ("Although a validity study of an employment test can be sufficient to prove business necessity, it is not necessary if the employer demonstrates the procedure is sufficiently related to safe and efficient job performance.").

The EFT is meant to be just a bare minimum standard since it represents just a "fraction" of what an employee is going to be doing on a daily basis. *See* Ex. 11 (Totten dep. at 32-33, 36). Given the numerous descriptions of the day-to-day job responsibilities provided by the claimants themselves, the acknowledgments that the job descriptions for housekeepers and floor techs are accurate, and the acknowledgments that the best way to get to floor level is by bending one's knees, the

EFT is fair and accurate, especially for housekeepers who must not only sanitize at floor level but inspect, too.[12]  Further,  it also is consistent with business necessity in that the EFT was developed and revised based upon the number and frequency of job related injuries. *Id.* at 76-77. Part of the rationale behind the EFT was to address the injury rate company wide.  Through the implementation of the EFT and other safety measures, the workplace injuries have decreased and are below national averages. This confirms the business necessity of the test, since part of its aim is to increase safety for employees and visitors of medical facilities.

Despite adequate time to develop evidence to support its claim, the EEOC has wholly failed to meet its burden of proof.  The EEOC has failed to demonstrate that that EFT either screens or tends to screen out individuals with disabilities, and HHS has established the EFT as job-related and consistent with business necessity. HHS must be granted summary judgment as to the First Claim for Relief.

### C.   Not All Claimants are Qualified Individuals with Disabilities.

> *1.   Several claimants were not disabled or did not provide notice of a disability to HHS, refused to take the EFT, or had impairments that were not related to their inability to pass the EFT.*

"ADA protection extends only to a qualified individual with a disability." *Peyton v. Fred's Stores of Arkansas, Inc.*, 561 F.3d 900, 902 (8th Cir. 2009). To that end,  the  EEOC  mush  establish  that  each  claimant  had  a  physical  or  mental

---

[12] In this case, the EFT has been validated in three separate ways – internally through Totten's efforts, including his own personal experience performing the job duties of a housekeeper and floor tech; externally through Dr. Baker's detailed analysis based on a variety of data and actual on-site observation; and in the course of this litigation through the deposition testimony of the claimants themselves who agreed with the written job descriptions and described their roles as physically demanding and fast-paced.

impairment that substantially limited one or more major life activities or a record of such impairment.[13] *See* 42 U.S.C. §12102(1). Courts should not rely on the diagnosis or label applied to an impairment when determining if a claimant is in fact disabled. *See Nyrop v. Independent School Dist. No. 11*, 616 F.3d 728, 734 (8th Cir. 2010) ("in order to prove she is disabled, Nyrop cannot merely rely on her diagnosis but, instead, must show her MS substantially limits her in a major life activity"); 29 C.F.R. § 1630.2(j)(1)(iv) (determination of whether an impairment substantially limits a major life activity "requires an individualized assessment").

While broad, "the ADA's definition of disability is not unlimited." *Orr v. City of Rogers*, 232 F.Supp.3d 1052, 1064 (W.D. Ark. 2017). In fact, EEOC regulations specify that "not every impairment will constitute a disability within the meaning of [the ADA]." 29 C.F.R. §1630.2(j)(1)(ii). None of the claimants had "obvious" disabilities, like "partially or completely missing limbs," and none had "mobility impairment requiring the use of a wheelchair" as discussed in 29 C.F.R. §1630.2(j)(3)(iii). Instead, they had less obvious impairments, mostly knee-related, that did not substantially limit them at the time they took the EFT.

For instance, claimant Gill (who had a knee replacement in 2015) testified that her knee was sensitive to touch, which impacted her ability to place it on the ground. But, she had full function of her knee, could bend it 90 degrees, and actually passed the part of the EFT that required her to touch her knee to the ground. Another

---

[13] There is no duty to accommodate employees who only meet the "regarded as" prong of the definition. *See Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1080 (8th Cir. 2009) (noting that "an employee who is 'regarded as disabled' is not entitled to a reasonable accommodation").

claimant with a 2017 knee replacement (Parry) testified that she could use her knee however she wanted and had no problems with walking or climbing stairs. Parry also had no issues taking the EFT in 2019 -- her knee was not hurting at the time. She simply refused to take the EFT because she thought it was "unfair."

Claimant Rodriguez broke his knee cap in 2010, but he fully recovered and was experiencing no pain in 2016 when he took the EFT. Broken bones typically are not "substantially limiting." *See Orr*, 232 F.Supp.2d at 1064-1065 (stating it was a close call, but ultimately finding that plaintiff's broken arm – which did not heal correctly, leading to a year-long impairment – presented a fact question on the disability issue) (citing *Clark v. Boyd Tunica, Inc.*, 2016 WL 853529, at *5 (N.D. Miss. Mar. 1, 2016) (broken foot not a disability); *Kruger v. Hamilton Manor Nursing Home*, 10 F.Supp.3d 385, 389 (W.D.N.Y. 2014) ("Plaintiff's broken arm is not an injury considered a 'disability' under the ADA, and Plaintiff has failed to allege that her injury was more than temporary."); *Zick v. Waterfront Comm'n of N. Y. Harbor*, 2012 WL 4785703, at *5 (S.D.N.Y. Oct. 4, 2012) ("Plaintiff's broken leg is simply not an injury considered a 'disability' under the ADA."); *Bliss v. Morrow Enters., Inc.*, 2011 WL 2555365, at *6 n.2 (D. Minn. June 28, 2011) (expressing doubt that plaintiff's broken arm that required multiple surgeries was a disability even "under the broader standard adopted by Congress in the [ADAAA]")).

Bruising, strains and generalized knee pain are not disabilities, either, the types of impairments alleged by several claimants including Sidwell, King, Lewis and Taylor. *See Skerce v. Torgeson Electric Company*, 852 Fed.Appx. 357, 362 (10th Cir.

2021) (although elbow injury that prevented plaintiff from working as an electrician for almost three months and limited him to lifting ten pounds for at least two months was a disability, his other ailments—high blood pressure, depression, chronic back pain, chronic knee pain, and joint pain – were not); *Martinez v. N. Y. State Div. of Human Rights*, 2015 WL 437399, at *8 (S.D.N.Y. Feb. 2, 2015) (temporary injuries from a slip-and-fall did not result in a disability under the ADA); *Bush v. Donahoe*, 964 F.Supp.2d 401, 421 (W.D. Pa. 2013) (ankle/foot sprain is not a disability); *see also Tramp v. Associated Underwriters, Inc.*, No. 8:11CV371.2013 WL 3071258, *7 (D. Neb. June 17, 2013), aff'd 768 F.3d 793 (8th Cir. 2014) (plaintiff asserted that she was disabled because of knee pain that limited her ability to perform her daily tasks; to remedy the pain, she scheduled arthroscopic knee surgery; lower court still concluded it was ""highly doubtful" that plaintiff was disabled).

Even a past heart attack (like the "minor" one claimant Williams claimed) is not the basis for a disability when the person has fully recovered and has no resulting impairments that are substantial. *See Cunningham v. Novo Nordisk*, 615 Fed. Appx. 97 (3d Cir. 2015) (plaintiff offered "no evidence demonstrating that, because of her heart attack and subsequent surgery, she was substantially limited in a major life activity" and "admitted that, since returning to work, she has been fully capable of working, performing her job duties, and caring for herself."); *Gates v. Cardillo*, 4:17-CV-02320-NCC, 2019 WL 2137587, *5 (E.D. Mo. May 16, 2019) (impairment resulting from cardiac arrest failed to meet the broad definition of disability, and plaintiff admitted that her need to wear a defibrillator did not affect her ability to do the job;

"While the Court has no doubt that Gates' cardiac incident was severe and the resulting use of a defibrillator is difficult, . . . being unable to run a marathon, lift over 40 pounds, or walk miles are not activities that most people in the general population can do").

And to the extent that the EEOC argues that HHS should have accommodated the claimants in some way, it must establish that HHS knew of both the disability and the employee's desire for accommodations for that disability.[14] *See Ballard v. Rubin*, 284 F.3d 957, 962 (8th Cir. 2002); *see also Peyton*, 561 F.3d at 902 (plaintiff must still establish that employer knew about the claimant's disability and the claimant requested accommodations or assistance for his or her disability); *Broadwater v. Minnesota Dept. of Human Services*, 22 F.Supp.3d 989, 998 (D. Minn. May 23, 2014 (accommodation claim failed because plaintiff "could not recall any instance in which she communicated to [defendant] that she was requesting a transfer because of her disability"). Several claimants admittedly refused to take the EFT (such as Roberts, Bingham and Parry) or failed to request an accommodation (such as Bingham, King, Lewis, Parry, Sidwell, Taylor and Williams).

Regardless of labels used by the EEOC to describe the claimants' health or diagnoses of past issues, the vast majority of the claimants testified they a) did not consider themselves disabled and did not ask for an accommodation; b) had no

---

[14] An accommodation is unreasonable if a) it requires the employer to eliminate an essential function of a job (such as the ability to clean and inspect at floor level) or b) there is no causal connection between the accommodation and the limitations of the disability. *See Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 687 (8th Cir. 2003); *Dropinski v. Douglas County, Neb.*, 298 F.3d 704, 709 (8th Cir. 2002); *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1102 (8th Cir. 1999).

medical restrictions; or c) were fully able to perform their jobs.  A few simply refused to take the EFT. An individualized review of each claimant's testimony shows that whatever impairments were at issue, the EEOC cannot establish that they had an impairment that was substantially limiting or that HHS was on notice of any substantially limiting impairment.

2. *Claimants Gibbs and Roberts were not qualified or posed a direct threat to themselves or others.*

The ADA defines a qualified individual as one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  . . . [C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). A person is not qualified if he or she would "pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). Business necessities may include ensuring that the workplace is safe and secure. *See E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995) ("It would seem that a requirement that employees not pose a significant safety threat in the workplace would obviously be consistent with business necessity: a safe workplace is a paradigmatic necessity of operating a business."); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1119-1123 (11th Cir. 1993) (holding that protecting employees from workplace hazards is a "business necessity" under Title VII); *see also Chandler v.*

*Louisiana-Pac. Corp.*, No. CV 1:21-00341-KD-C, 2022 WL 15570702, at \*28 (S.D. Ala. Oct. 27, 2022).

An accommodation is unreasonable if it requires the employer to eliminate an essential function of the job. *See Coates*, 2021 WL 4991526, \*4 (accommodation request to waive the lifting and other physical requirements of his job was unreasonable) (citing *Knutson v. Schwan's Home Serv.*, Inc., 711 F.3d 911, 914-916 (8th Cir. 2013) (employer's judgment about an essential job function "is considered highly probative"; employer is not required to reassign existing workers to assist an employee with essential duties)).

Further, when an employee has sworn in an application for disability benefits that he or she is unable to work at any job, the employee must proffer a sufficient explanation "to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of [his] job, with or without 'reasonable accommodation.'" *See Lane v. BFI Waste Systems of North America*, 257 F.3d. 766, 769 (8th Cir. 2001) (citing *Cleveland v. Policy Mgmt. Sys.*, 526 U.S. 795, 807, 119 S. Ct. 1597, 143 L.Ed.2d 966 (1999); *see also Wheeler v. Baldor Elec. Co.*, 386 F.Supp.2d 1033, 1036 (W.D. Ark. 2005) ("[S]ummary judgment should issue unless there is 'strong countervailing evidence that the employee ... is, in fact, qualified.').

One of the essential elements of an HHS housekeeper's job is the ability to get to floor level to both sanitize and inspect the entire room for blood and other bodily fluids; another is the ability to maintain a fast pace. Gibbs (who was already on Social

Security disability for chronic pain syndrome and arthritis) admittedly could do neither. She requested light duty because she wanted less walking, less standing, less lifting, and less bending to get to floor level to clean. In fact, Gibbs could not lift much weight, found walking from the parking lot "physically hard" and could not bend her knees. And she admittedly took a "much longer time" to clean. *See* Ex. 27 (Gibbs dep. at 45-47).

A housekeeper who cannot sanitize and inspect at floor level and who cannot maintain a proper pace in order to open rooms for incoming patients is not performing the essential functions of the job, and that impacts HHS's operation and (more importantly) patient safety. *See Olsen v. Capital Region Medical Center*, 713 F.3d 1149, 1154 (8th Cir. 2013) (discussing patient safety as an essential job function of a mammogram tech in a hospital setting); *Alexander v. Northland Inn*, 321 F.3d 723, 726-727 (8th Cir. 2003) (affirming summary judgment for hotel since plaintiff was not qualified; housekeeping supervisor was medically restricted from vacuuming, and vacuuming was an essential job function). The EEOC cannot establish that Gibbs is a qualified individual.

Roberts also was not a qualified individual and posed a direct threat to himself in his role as a floor tech. Roberts testified that he experienced severe pain ever day he worked at HHS due to bone-on-bone contact in his knees and "bad" arthritis in his back, and experienced neuropathy so severe that he could not feel his feet. Yet, he testified that his job was fast-paced, required him to constantly walk miles each day,

and be on his feet.[15] And he was unable to get to floor level, which HHS considered essential. *See* Ex. 4 (Roberts dep. at 46-48, 53-54, 70-71, ex. 4 (Floor Tech must be capable of "standing, walking, squatting, bending, ... kneeling and reaching continuously throughout a shift")); *see also Alexander*, 321 F.3d at 727 ("Essential functions of the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'"). He was unable to work at all shortly after his termination, applied for Social Security disability, and then went into total kidney failure, which would have prevented him from performing the floor tech job. The EEOC cannot establish Roberts was a qualified individual based on his own testimony. *See Magnussen v. Casey's Marketing Co.*, 787 F.Supp.2d 929, 948-949 (N.D. Iowa 2011) (essential function of plaintiff's job as store manager was to stand eight hours a day, but she could only stand three hours; plaintiff also could not have it both ways by claiming she was qualified but also applying for Social Security benefits upon termination); *see also Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093-1094 (5th Cir. 1996) (as evidenced by his own testimony, plaintiff was not qualified because he was a safety risk to himself and others; he recalled "walking to an incinerator at one point and his legs hurting so bad that he could hardly walk, he couldn't climb, and he lost his concentration").

### D.   The Claimants Were Not Terminated Due to a Disability.

The second and final Claim for Relief is that employees with alleged disabilities who failed to pass the EFT were terminated because of their alleged disabilities. *See*

---

[15] Although his doctor's note did not prohibit Roberts taking the EFT, he refused to take it because he did not believe he could pass it.

Complaint, Para. 34. As established and discussed above, the EEOC has failed to support that many of the claimants were disabled or if disabled, qualified. The claimants have been deposed and many testified that they did not consider themselves disabled. Without first establishing that any claimant was disabled, there can be no relief granted for this claim.

To establish a *prima facie* case of disability discrimination under the ADA, the EEOC must show that the claimants (1) were disabled as defined in 42 U.S.C. §12102(2); (2) were qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) suffered an adverse employment action because of a disability. *See Alexander*, 321 F.3d at 726. As demonstrated throughout this Motion, the EEOC has failed to make the requisite showing.

Even if it is assumed that any claimant was disabled, the claims still fail. Any termination decisions were not made on the basis of any alleged disabilities, which arguably did not even exist.  Rather, any employment decisions were based upon the business necessity of HHS and the failure of the individuals to be able to perform the essential functions of the position. Essential functions include "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). An employer's judgment on this question is highly probative. *See Knutson* 711 F.3d at 914-916; 29 C.F.R. § 1630.2(n)(3). The testimony in this matter is clear that the tasks identified on the EFT are truly essential to the positions. This is confirmed in the written job descriptions for the positions.

The Court in *Alexander* considered similar issues and reached the conclusion that vacuuming was an essential function. *Id.* at 726.  Part of the reason was based upon the need to maintain cleanliness in the facility, the number of employees available and issues with truancy.  A similar result should be reached here, since it is unquestioned that maintaining a clean and sanitized facility is essential and that HHS frequently faces staffing issues, which requires all employees to be able to perform the essential functions to properly maintain the facility.

In all, it is clear that no claimant was discharged on the basis of any alleged disability.  To the contrary, any adverse employment action was the result of the failure of any individual to meet the legitimate and established essential functions of the position.

### E.    Several Claimants Failed to Mitigate Their Damages.

Finally, several claimants (Lewis, Licea, Roberts, Sidwell, Taylor and Williams) were unable to or refused to seek other employment following the termination of their employment by HHS. Therefore, any backpay damages should be cut-off. *See Tomlinson v. Omaha Steel Castings, Co.*, No. 8:08CV176, 2009 WL 1652260, *5-6 (D. Neb. June 11, 2009) (minimal effort by plaintiff did not represent "reasonable diligence" or an "honest effort" to find substantially similar work) (citing *Mathieu v. Gopher News Co.*, 273 F.3d 769, 783–84 (8th Cir.2001)).

## IV.    Conclusion.

The EEOC waited years to file this lawsuit, prejudicing HHS's ability to defend itself.  And there is absolutely no evidence to support any claims being advanced by

2820156v-1

the EEOC in this matter. The EEOC has failed to identify any qualified individual with a disability that would support a violation of the ADA. Further, all employment decisions were based upon the legitimate and non-discriminatory business necessity of HHS, which did not screen or tend to screen any disabled individuals.

HHS requests this Court issue an Order granting summary judgment on all claims, dismissing this action with prejudice and granting to HHS any other such relief this Court deems equitable.

Respectfully submitted:

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
8211 East Regal Place, Suite 100
Tulsa, Oklahoma 74133
(918) 828-9075
FAX: (918) 828-9076
EMAIL: gregg.lytle@qpwblaw.com

By: Gregg J. Lytle (Okl. Bar No. 20759)

*Attorneys for Defendant (Admitted Pro Hac Vice)*

and

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL: wjackson@wlj.com
        mkaemmerling@wlj.com

By: Stuart Jackson
    William Stuart Jackson (92189)
    Michelle M. Kaemmerling (2001227)

*Attorneys for Defendant*

2820156v-1